UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF AN               :
APPLICATION FOR SEARCH AND        :
SEIZURE WARRANT                   :     March 2, 2018

3:18mj288RAR

FILED
2018 MAR -5  A 10: 39
DISTRICT COURT
CT

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Daniel A. Spera, a Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, state:

### INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United Sates Code. I have been a Special Agent of the FBI since July 2011. I am currently assigned to the Connecticut Violent Crime Task Force of the New Haven Division. My experience as a FBI Agent has included the investigation of cases concerning domestic and international terrorism, bombing matters, narcotics trafficking, firearms act violations, money laundering, fraud, fugitive apprehension, stolen property, robbery, kidnapping, and other matters. I have received formal training at the FBI Academy in Quantico, Virginia, and have gained experience in interview and interrogation techniques, conducting physical and electronic surveillance, Title III intercepts, and various other criminal procedures. I have been an affiant in support of numerous search and seizure warrants, and I have participated in execution of numerous search warrants and arrest warrants.

2. Over the past seventeen years in law enforcement, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated

controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses. I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.

3.  I am one of the case agents who have directed the investigation that is the subject of this Affidavit in conjunction with law enforcement agents and officers, and I am thoroughly familiar with the information contained herein. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of certain property—one electronic devices (wireless telephone) that is currently in law enforcement's possession.

4.  The statements contained in this affidavit are based, in part, on my own involvement in this case; on information provided by other federal agents and task force officers; on information provided by law enforcement officers of the Hartford Police Department and Manchester Police Department; on information developed through surveillances; and on my experience and training. Since this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrants, I have not included every fact known to me

concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the existence of probable cause to support the issuance of the requested warrants.

## PROPERTY TO BE SEARCHED/EXAMINED

5. I submit this affidavit in support of a search warrant for the following: One Apple iPhone, wireless telephone, color silver, ("**Subject Device #3**" or the "**Subject Device**"), IMEI 013985008235845.

6. For the reasons set forth below, there is probable cause to believe, and I do believe, that located within **Subject Device #3** is property constituting fruits, instrumentalities, contraband, and other evidence of violations of the following offenses: 18 U.S.C. §922(g) (Unlawful Possession of a Firearm by a Convicted Felon), 18 U.S.C. § 924(c)(1)(A) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) and 21 U.S.C. §841(a)(1) (Possession with the Intent to Distribute and Distribution of Controlled Substances) (together, the "Target Offenses"). The applied-for warrant would authorize the search of **Subject Device #3** for evidence of violations of the Target Offenses as described in Attachment B, for the purpose of identifying electronically stored data particularly described in Attachment B2.

## PROBABLE CAUSE

### Background to the Investigation

7. On January 2, 2018, Special Agent (SA) Daniel Spera, Task Force Officer (TFO) Robert Fogg, TFO Chris Reeder, Sergeant John O'Hare and Detective Shawn Krom from the Hartford and Manchester Police Departments, as well as other members of the Hartford Police Department Violence Reduction Team and the Manchester Police Department, were involved in searching for fugitive named James GOOLSBY, who was wanted for a homicide in Manchester, CT. The investigators were dressed in plain clothes and operated unmarked cars.

8.  On December 30, 2017, Detective Graham and Detective Bontempo of the Manchester Police Department conducted a traffic stop on a vehicle operated by Kesha Goolsby. Denroy FABLE was a passenger in the vehicle and was identified by his Connecticut driver's license. During the traffic stop, the detectives learned that FABLE is Kesha Goolsby's boyfriend. A search of a law enforcement database shows an address of 820 Wethersfield Avenue, Apartment A10, Hartford, CT as an address for FABLE.

9.  On January 2, 2018, a source of information ("SOI") provided information as to the whereabouts of James GOOLSBY. SOI had been with James GOOLSBY earlier in the day on January 2, 2018. SOI said that James GOOLSBY was staying with Kesha Goolsby's boyfriend (i.e., FABLE), who SOI knew as "Kik". As noted, Kesha Goolsby is the sister of the fugitive James GOOLSBY.

10. SOI provided a description of the area in which James GOOLSBY was staying with FABLE. Based on the description provided by SOI, Detective Hearn used Google Street View to view the area. SOI identified the apartment building at 820 Wethersfield Avenue, Hartford, CT as the building where James GOOLSBY was staying with FABLE. SOI provided further information that the apartment was on the first floor of the building.

11. In addition, a second credible and reliable Hartford Police Department source provided information to the Hartford Police Department that FABLE resided at 820 Wethersfield Avenue, Apartment A10, Hartford, CT. This source has provided reliable information to the Hartford Police Department in the past.

### Motor Vehicle Stop & Arrest of FABLE

12. On January 2, 2018, investigators initiated surveillance on 820 Wethersfield Avenue, Hartford, CT. While conducting surveillance, investigators learned that a state judge

4

had authorized a state arrest warrant for GOOLSBY and a state search and seizure warrant for FABLE's apartment at 820 Wethersfield Ave., Apt. A10, Hartford, CT.

13.     At approximately 7:45pm, investigators observed a dark sedan (later identified as a 2003 Mercedes Benz with Connecticut Registration AK34307 that is registered to FABLE) pull in the parking lot at 820 Wethersfield Ave. Approximately fifteen minutes later, a black male entered the driver's side door of the 2003 Mercedes Benz drove away from 820 Wethersfield Avenue, Hartford, CT. Investigators observed the vehicle drive to 932 Wethersfield Ave. and, after a brief stop, the vehicle drove away.

14.     The detectives followed the vehicle and requested assistance, suspecting that FABLE and GOOLSBY were in the 2003 Mercedes Benz. Shortly thereafter, investigators initiated a traffic stop of FABLE's 2003 Mercedes Benz in the vicinity of Airport Road, Hartford, CT.

15.     During the car stop, investigators identified three occupants in the car. Investigators identified FABLE as the driver of 2003 Mercedes Benz and investigators identified Manson BARCLAY and Jason BARCLAY as passengers in 2003 Mercedes Benz.

16.     During the stop, Detective Krom asked FABLE to exit the 2003 Mercedes Benz. FABLE exited the car and immediately placed his hands on the roof of the car as if he were expecting to be searched. Due to officer safety concerns, Detective Krom conducted a pat frisk and felt a hard object in the upper left side of FABLE's jacket, which Detective Krom believed to be a firearm. Detective Krom advised the other officers involved in the traffic stop that he believed that FABLE had a firearm. Detective Krom addressed his concern with FABLE, who confirmed that he had a gun in his pocket. Investigators removed the gun from FABLE's pocket and secured the gun. The firearm was identified as a Ruger 9mm model SR9C, serial number

5

334-35989, with "Prescott, AZ USA" stamped on the slide. The firearm was loaded with 10 rounds of Luger 9mm ammunition. A query of NCIC for the Ruger 9mm serial number 334-35989 revealed the firearm was not reported stolen.

17. After seizing the firearm from FABLE, Detective Krom searched FABLE incident to his arrest and seized a plastic baggie containing suspected narcotics from FABLE's front jean pocket. In the plastic baggie, Detective Krom found approximately two grams of a white rock like substance (suspected cocaine base) and approximately 2.4 grams of a green leafy substance in a plastic bag. TFO Fogg subsequently field-tested the suspected cocaine base using a NIK test kit, which produced a positive reaction for the presence of cocaine.

18. From the passenger compartment of the Fable's 2003 Mercedes Benz, investigators seized (1) one Apple iPhone, wireless telephone, color silver, model number A1549 ("**Subject Device #1**"); and (2) one ZTE wireless telephone, color black, model number Z798BL, serial number 329F74452D1E ("**Subject Device #2**"). As discussed below, on January 18, 2018, investigators obtained federal search warrants for Fables 2003 Mercedes Benz and for **Subject Device #1** and **Subject Device #2**. During the search of the 2003 Mercedes Benz, investigators seized **Subject Device #3** from the front center console of the car.

### Interview of FABLE

19. Investigators transported FABLE to 50 Jennings Road, where he was secured within a locked interview room. Investigators removed the FABLE's handcuffs and offered water to FABLE prior to the interview. At approximately 9:09 p.m. hours, TFO Fogg and TFO Reeder advised FABLE of his *Miranda* rights. FABLE completed a Hartford Police Department Miranda Rights waiver form prior to the interview. During the interview, FABLE verbally stated that his passengers did not know that he (FABLE) was in possession of a firearm and that he just

picked his passengers up prior to being stopped by the police. FABLE further said that the firearm and the crack cocaine that were found on his person belonged to him. FABLE provided a sworn written statement attesting to his statements. In addition, FABLE later swore to the truthfulness of his statement in the presence of Sergeant O'Hare. FABLE also said that he just recently purchased the Mercedes Benz, which he was stopped in. FABLE said that the Mercedes Benz was both registered and insured in his name.

### Seizure of Evidence from FABLE's Apartment

20.   After FABLE's arrest, SA Spera and members of the Manchester Police Department and Hartford Police Department conducted a search of FABLE's apartment at 820 Wethersfield Avenue, Apartment A10, Hartford, CT pursuant to a state search warrant. James GOOLSBY was located inside the apartment. Investigators arrested GOOLSBY pursuant to a state arrest warrant. In addition, investigators executed the state search warrant for FABLE's apartment. During the search of the apartment, investigators located and seized, among other evidence, the following evidence: approximately 29 grams of a white powdery substance consistent with cocaine; approximately 4 grams of a white rock like substance consistent with crack cocaine; several individual packages of a grainy substance consistent with heroin which weighed approximately 25 grams; approximately 162 grams of a green leafy substance consistent with marijuana; a plate with a powdery residue; numerous unidentified pills believed to be Xanax; a grinder and a scale with powdery residue; and a bill from Eversource utility company in FABLE's name.

21.   During this investigation, I determined that FABLE has a criminal history that includes, among other convictions, a felony conviction for Criminal Possession of a Gun, in 2005. Therefore, FABLE is prohibited by federal law from lawfully possessing firearms and

ammunition that have been transported in interstate commerce. Based on a preliminary analysis, investigators believe that the firearm that was seized from FABLE -- i.e., the Ruger 9mm model SR9C, serial number 334-35989, with "Prescott, AZ USA" stamped on the slide -- was manufactured outside of Connecticut and therefore traveled in interstate commerce.

### Search of FABLE's car

22.     On January 18, 2018, The Honorable Donna Martinez, United States Magistrate Judge for the District of Connecticut, authorized a warrant to search FABLE's 2003 Mercedes Benz and a warrant to search **Subject Device #1** and **Subject Device #2** (which were seized from the passenger compartment of the 2003 Mercedes Benz) for evidence of the Target Offenses. To conduct the search of **Subject Device #1** and **Subject Device #2**, investigators sent the phones to a laboratory for the search and the examination of the phones in accordance with the search warrant. Investigators currently are waiting for the results of the search of **Subject Device #1** and **Subject Device #2.** On January 24, 2018, SA Daniel Spera executed the search warrant for the 2003 Mercedes Benz, which was already in ATF custody. During the search of the 2003 Mercedes Benz, SA Spera found another phone (i.e., **Subject Device #3**) in the cup holder in the center console of the car.

### GENERAL INFORMATION REGARDING CELLULAR PHONES

23.     During my career, I have investigated and participated in numerous investigations that involved drug trafficking violations and related offenses such as violations of firearms laws. I know, based upon my training and experience, that criminals involved in the drug trade routinely maintain in their residences and their vehicles multiple cellular telephones.

24.     Based upon my training, experience, and participation in this and other drug and firearms trafficking investigations, as well as information provided to me by other law enforcement

8

officers involved in the investigation of said illegal activities, I know that:

a. that drug and firearms traffickers commonly use multiple cellular telephones as a means of communicating with their customers and sources of supply and frequently lease or purchase these services using nominees. They use multiple cell phones to compartmentalize their customers, their sources of supply, their other narcotics trafficking associates and their activity, and to thwart law enforcements efforts to track their activity. Further, if the customers or sources of supply do not know a trafficker has been arrested, they will continue to attempt to contact him through these and mobile telephones and the ability to access such devices by receiving incoming messages or calls allows identification of such customers or sources of supply.

b. that narcotics and firearms traffickers' cellular telephones commonly maintain data bases, contacts, customer information, supplier information, text messages, emails and photographs of narcotics and firearms trafficking activity. The cellular telephones are used as electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization. Traffickers also maintain photographs and videos of participants and associates in said narcotics trafficking and illegal firearms activities, and property acquired as a consequence of these illegal activities. I know that narcotics traffickers, such as FABLE, communicate via cellular telephones regarding their illegal firearms and/or narcotics trafficking activities, and that narcotics traffickers often maintain on their cellular telephones photographs and videos of their illegal firearms and/or narcotics trafficking activities;

c. I know through training and experience that a modern cellular telephone handset stores data relating to the device's usage. This data includes call logs, calls received, stored telephone numbers, text messaging, email messages, video files, image files, and audio files. Moreover, this data, even if untouched for a long time or deleted, may be retrievable through forensic examinations conducted by qualified personnel. A cellular telephone has become a virtual recorder of a person's daily activities. Data within a cellular telephone can log identifiers regarding calls made and received as well as when these conversations occurred. The data may include information that includes call logs, pictures, and a contact list of known acquaintances or coconspirators. Due to this potential of data, a cellular telephone has become an indispensable piece of evidence in criminal investigations. Furthermore, the data contained within cellular telephones is, and can be, useful in identifying the actual owner of the telephone as well as who may have been using the telephone by examining the calls or messages sent, received or missed. Further, the data contained within the device is useful to investigators

in that it may show communication between a victim, a suspect and other coconspirators or other potential valuable witnesses prior to, during or after the time of the crime or incident. I believe that the information contained within the **Subject Devices** shall provide evidence into violations of the Target Offenses.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   <u>Wireless telephone:</u> A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.   <u>Portable media player:</u> A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   c.   <u>GPS:</u> A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna

10

        receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    d.    <u>PDA:</u> A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

26. Based on my training, experience, and research, I know the **Subject Device** has various capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In fact, most modern cellular telephones have capabilities that allow them to serve, at a minimum, as wireless telephones and digital cameras. They also permit the storage of telephone numbers, names, addresses, photographs and other forms of information. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and with whom they communicated.

## SEARCH WARRANT FOR CELLULAR PHONES

27. With regard to **Subject Device #3**, I request permission to enter and search the devices for evidence relating to the Target Offenses (<u>i.e.</u>, the illegal trafficking of narcotics and the illegal possession and trafficking of firearms). Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by narcotics trafficking associates/co-conspirators to communicate regarding, among other things, the possession and distribution of narcotics, the possession of firearms and ammunition, the sale of firearms and the

use of firearms. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of email communications between co-conspirators regarding narcotics trafficking activities and illegal firearms activities. Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses associated with illegal firearms and narcotics activities. Also based on my training and experience, and information developed during this investigation, I know that wireless phones may contain videos and images of coconspirators, narcotics, firearms and ammunition. I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations to ship, receive, or store narcotics or firearms, as well as locations of meetings involving narcotics trafficking associates/co-conspirators.

    28.    Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the importation and distribution of narcotics:

    a. the telephone number, ESN number, serial number, and SIM card number of said phones;

    b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said devices;

    c. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d. any and all records, however created or stored, which tend to demonstrate ownership and use of the phones, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phones;

    e. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phones, such as passwords, sign-on codes, and program design;

 f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

 g.  saved searches, locations, and route history in the memory of said devices;

 h.  internet browsing history, to include, internet searches in the memory of said device; and

 i.  Images and videos in the memory of said device.

29.    It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

30.    It is also requested that the warrant be deemed executed once **Subject Device #3** has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.    The warrant applied for with respect to **Subject Device #3** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32. As described above and in Attachment B2 to the requested search warrant, this application seeks permission to search and seize things that the **Subject Device** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. Searching for the evidence described in Attachment B2 may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B2, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B2.

## CONCLUSION

34. Based on the foregoing, there is probable cause to believe, and I do believe, that this affidavit supports probable cause for a search warrant authorizing the search and the

examination of **Subject Device #3** described in Attachment A to seek the items described in Attachment B.

35. Because the requested warrants seek only permission to examine property already in law enforcement's possession, the execution of the requested warrants do not involve the physical intrusion onto a premises. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

_____
DANIEL A. SPERA
SPECIAL AGENT
Federal Bureau of Investigation

Subscribed and sworn before me this 2nd day of March 2018.

/s/ Robert A. Richardson
_____
ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE